[Civil No. 3730.   Filed March 23, 1936.]

[56 Pac. (2d) 655.]

L. V. GUTHRIE, Appellant, v. CITY OF MESA, a Municipal Corporation, et al., Appellees.

Messrs. Beer, Walsh & Wilmer, for Appellant.

Mr. M. J. Dougherty, City Attorney of Mesa, for Appellees.

McALISTER, J.—This is an appeal by L. V. Guthrie from a judgment dismissing a complaint filed by him against the city of Mesa and its officers in which he sought to restrain and enjoin them from making certain improvements, from issuing its revenue bonds as security for the funds to be borrowed for this purpose, and from calling an election to authorize them to take such action.

According to the record before us, the city decided in the summer of 1935 to extend its water and sewer systems, both of which were municipally owned and managed, and to do this it was necessary that it obtain funds in the sum of $75,000. The only avenue then open to it as a source of revenue was one of the agencies of the federal government, particularly the Federal Emergency Administration of Public Works, which was established by order of the President pursuant to an Act of Congress (40 U. S. C. A., § 401 et seq.), for the purpose of advancing to cities, municipalities, school districts, drainage districts, etc., funds to be used for public enterprises that are beneficial to the particular unit involved and at the same time helpful in reducing unemployment and restoring the purchasing power of the people. The conditions upon which such loans are made are that 55 per cent. of the amount advanced shall be returned to the government and its repayment secured by the general obligation, revenue or special assessment bonds of the political subdivision receiving them, the remaining 45 per cent. constituting a straight-out gift or grant.

To take advantage of this offer of the government, the mayor and common council of the city of Mesa, on

the 19th day of July, 1935, adopted Resolution No. . 440, declaring its intention to call a bond election for the purpose of submitting to its qualified electors the question whether the city should borrow from the Federal Emergency Administration of Public Works the sum of $75,000 for financing the construction of its sewer and water extensions and secure the repayment of 55 per cent. thereof, or $41,250, by issuing its revenue bonds in that sum payable wholly and exclusively out of a fixed amount of the revenue derived from its water plant and system, the bonds to constitute a first and paramount lien upon the amount of the revenue from the water system thus pledged to their payment. The remaining $33,750, or 45 per cent., being a gift or grant, will not be evidenced by bonds.

Soon after the passage of this resolution, L. V. Guthrie, a qualified elector and real property taxpayer of the city of Mesa, filed an action in the superior court to restrain it and its officers from proceeding further with the improvements designated therein, and in his complaint alleged that the assessed valuation of the city as shown by its last assessment roll was $1,855,793, and its outstanding general obligation bonds $528,500, a part of which were issued and sold when the assessed valuation of the city was in excess of $4,500,000 for the purchase and construction of municipally owned waterworks and sewer, gas and electrical distributing systems. The plaintiff alleged further that because of these facts the defendants were without power to issue the revenue bonds of the city, even if authorized to do so by a majority vote of its qualified electors, for these reasons: First, it is already bonded to the extent of its general obligation bonding capacity and has no authority to issue additional bonds in excess of 15 per centum of its

present assessment as shown by its last assessment roll; second, it has no authority to divide the income from its waterworks system in separate funds and pledge a portion thereof for the payment of the proposed water and sewer extension revenue bonds; third, it is without right or authority to direct and apply any portion of the income from the waterworks to a payment of a loan obtained for the purpose of extending its present waterworks and sewer systems.

To this complaint the defendants filed a general demurrer which was sustained, and the court, following plaintiff's announcement that he would stand on his complaint, entered judgment in favor of defendants, and from it the plaintiff appeals.

█ The first and principal contention is that to carry out the proposed improvements will constitute a violation of the provisions of section 8, article 9, of the Constitution of this state, reading as follows:

"No county, city, town, school district, or other municipal corporation shall for any purpose become indebted in any manner to an amount exceeding four per centum of the taxable property in such county, city, town, school district, or other municipal corporation, without the assent of a majority of the property taxpayers, who must also in all respects be qualified electors, therein voting at an election provided by law to be held for that purpose, the value of the taxable property therein to be ascertained by the last assessment for State and county purposes, previous to incurring such indebtedness; except, that in incorporated cities and towns assessments shall be taken from the last assessment for city or town purposes; 'Provided, that under no circumstances shall any county or school district become indebted to an amount exceeding ten per centum of such taxable property, as shown by the last assessment roll thereof'; and provided, further, 'that any incorporated city or town, with such assent, may be allowed to become indebted to a larger amount, but not ex-

ceeding fifteen per centum additional, for supplying such city or town with water, artificial light, or sewers, when the works for supplying such water, light or sewers are or shall be owned and controlled by the municipality.''

If the obligation the city seeks to incur is an indebtedness within the meaning of this section, the contention of the plaintiff is correct and must be upheld, because the bonds the city has outstanding do exceed the sum for which this section permits it to become indebted under its present assessed valuation. However, appellees contend and are proceeding upon the theory that the indebtedness they desire to create is not one within the purpose of this provision, for the reason that the city does not propose to issue general obligation bonds payable from a general tax levied on the taxable property of the city, but intends to issue revenue bonds and pledge a portion of the funds derived from the operation of its waterworks in payment of them. In other words, since the proposed bonds are not to be satisfied from taxes levied on the assessed property within the city limits, but only from the receipts of one of its public utilities, namely, its waterworks, they do not constitute an indebtedness within the meaning of this constitutional provision. The fact, they say, that the resolution of intention and the bonds themselves provide specifically that there shall be set aside as a special fund a sufficient portion of the city's income from its water system to take care of the bonds as they mature and that the holder of them shall look solely to these revenues for their satisfaction and at no time have the right to other funds, or to compel any exercise of the taxing power of the city of Mesa to pay them or the interest on them, removes them from the class of debts to which reference is had in this provision of the Constitution. If the revenue the city derives from the

operation of its utilities, as well as that received from the levying of a tax for that specific purpose, were legally pledged for the payment of its present bonded obligation, it is clear that the indebtedness it now has in mind for the extension of its water and sewer systems could not be incurred, but such is not the case. The income from its waterworks is in no way pledged for the payment of any of its obligations, but is free of all levies and may be used as security for funds obtained for the improvement or enlargement of this system. In taking the course they have, appellees are in line with the great weight of authority. For instance, in 19 R. C. L. 985, section 281, is found this statement of the rule:

"It is generally held that a limitation upon municipal indebtedness is not violated by an obligation which is payable out of a special fund, if the municipality is not liable to pay the same out of its general funds should the special fund prove insufficient, and the transaction by which the indebtedness is incurred cannot in any event deplete the general resources of the municipality. But the mere fact that a special fund is created for payment is not enough to make the obligation valid. The creditor must look to the fund alone for his recompense; and if the municipality is liable generally, an indebtedness is created within the meaning of the debt limit provisions. It is generally held that contracts for local improvements, the cost of which is to be borne wholly by the property benefited, form no part of the indebtedness of the municipality within the meaning of the debt limit provisions. . . . So also when the receipts from a municipal water supply are pledged to meet an indebtedness incurred in establishing the waterworks, and the creditor has no right to look beyond this source for payment, it has been held that there is no indebtedness in the constitutional sense . . ."

In 44 C. J. 1131, paragraph 4064, is found this language:

"Except in some jurisdictions, the fact that a municipality has passed beyond its debt limit does not prevent it from contracting a debt payable expressly out of a special fund. The rule is applicable to a debt payable out of a fund derived from the income and revenue of a light or waterworks plant or other public utility constructed or purchased by the municipality, unless, in addition to the revenue, the property itself is mortgaged to secure payment of the indebtedness."

In McQuillin's Municipal Corporations (2d ed.), volume 6, page 45, is also found a very clear statement of the rule, and when the decisions of the courts on this question are examined, the fact is disclosed that more than 75 per cent. of the thirty jurisdictions in which the subject has been considered have expressed the same view. The following are among the many so holding: *Oppenheim* v. *City of Florence,* 229 Ala. 50, 155 So. 859; *Department of Water and Power* v. *Vroman,* 218 Cal. 206, 22 Pac. (2d) 698; *State et al.* v. *City of Miami,* 113 Fla. 280, 152 So. 6; *Ward* v. *City of Chicago,* 342 Ill. 167, 173 N. E. 810; *State ex rel. Boynton* v. *Kansas State Highway Commission,* 138 Kan. 913, 28 Pac. (2d) 770; *Kentucky Utilities Co.* v. *City of Paris,* 248 Ky. 252, 58 S. W. (2d) 361; *Young* v. *City of Ann Arbor,* 267 Mich. 241, 255 N. W. 579; *Blume* v. *State Board of Education,* 97 Mont. 371, 34 Pac. (2d) 515; *Brockenbrough* v. *Board of Water Commrs.,* 134 N. C. 1, 46 S. E. 28; *McClain* v. *Regents of University et al.,* 124 Or. 629, 265 Pac. 412; *Cathcart* v. *City of Columbia,* 170 S. C. 362, 170 S. E. 435; *City of Houston* v. *Allred,* 123 Tex. 334, 71 S. W. (2d) 251; *Faulkner* v. *City of Seattle,* 19 Wash. 320, 53 Pac. 365; *Casto and Shinn* v. *Town of Ripley,* 114 W. Va. 668, 173 S. E. 886.

In the few jurisdictions in which the opposite view has been taken, an examination of the decisions will disclose that the conclusions reached were the result of peculiarly restricted provisions of their state Constitutions or of old decisions regarded as binding. *Straughan* v. *City of Coeur D'Alene,* 53 Idaho 494, 24 Pac. (2d) 321; *Byars* v. *City of Griffin,* 168 Ga. 41, 147 S. E. 66; *Zachary et al.* v. *City of Wagoner,* 146 Okl. 268, 292 Pac. 345.

In several jurisdictions a distinction is made between revenue bonds issued to pay for the construction of new utilities and those issued to finance additions or extensions to those already in existence. Their theory is that if funds which have previously been earned by an existing utility and placed in the general fund of the city for the purpose of aiding in defraying its ordinary expenses are used to create a special fund to pay for the extension or improvement of that utility, additional taxes may become necessary and thus indirectly result in the revenue bonds becoming a municipal indebtedness. *Fjeldsted* v. *Ogden City,* 83 Utah 278, 28 Pac. (2d) 144. We are unable, however, to see any distinction in principle between the application of the revenues derived from an old utility to the creation of a special fund and using those from a new utility for the same purpose so long as the income from the old or existing utility is free and unpledged to the payment of any other municipal obligation. The mere fact that the municipality has been using such funds to help discharge its general expenses does not of itself mean that it must continue to do so and may not apply them to some other useful municipal purpose if the best interest of the city demands it. In *Seward* v. *Bowers,* 37 N. M. 385, 24 Pac. (2d) 253, 255, the court used this language:

"We see no merit in this theory. The town, under the law, may pledge the present revenue from the existing plant, and can certainly pledge the future income of the enlarged or improved plant."

And in *Searle* v. *Town of Haxtun,* 84 Colo. 494, 271 Pac. 629, the court said:

"The plaintiff, however, conceding that if the town were acquiring a wholly new plant an agreement to pay out of the revenue thereof only and a pledge of the revenue therefrom to pay the purchase price would not be a debt, and that such an agreement and pledge of the revenue of the mere improvements would not be such, insists that an agreement to pay out of the income of property already acquired and a pledge thereof creates a debt within our Constitution. . . .

"We see, however, no difference in substance between a promise or pledge of the future income of property which now has an income and a promise or pledge of the future income of property which now has none. If one would make the sum secured a debt, the other would. In either case the income is produced by property already owned by the city, which seems to be the condition which is condemned by the cases which plaintiff cites on this point."

If, notwithstanding the fact that the constitutional limitation as to indebtedness did not stand in the way, there existed any doubt as to the right or power of any municipality in Arizona to pledge the receipts from one of its self-liquidating utilities as security for the payment of funds borrowed for the purpose of constructing, bettering, or extending such an undertaking, it was removed in December, 1934, when the Third Special Session of the Eleventh Legislature enacted chapter 11 of the laws of that session, known as "the Revenue Bond Act of 1934." That act was passed for the specific purpose of enabling municipalities, where authorized by a majority vote of its qualified electors, to construct, improve or extend and operate revenue-producing un-

dertakings, to issue its bonds to finance the cost thereof, and to pledge a sufficient amount of the revenue from such undertakings to pay the bonds and the interest thereon as they become due. It further provides that such bonds shall constitute a prior and paramount lien on that portion of the revenue from the undertaking set apart to discharge them and that they shall be payable solely therefrom, but that they shall not constitute a debt of the municipality, nor shall their payment be enforced out of any other funds than those derived from the revenue pledged therefor. It is proposed to issue the bonds in question in strict conformity with this act and when this is done there can be no question as to their validity.

The last proposition is that an Arizona city operating under a general charter may not pledge or devote the net revenue, or a portion thereof, arising from the operation of one of its own utilities to the creation of a special fund for the satisfaction of revenue bonds issued under "the Revenue Bond Act of 1934." This, we think, wholly without merit, because subsection (c) of section 3 of that act provides that such municipalities shall have the power "to pledge to the punctual payment of said bonds and interest thereon an amount of the revenue of such undertaking . . . sufficient to pay said bonds and interest as the same shall become due and to create and maintain reasonable reserves therefor." And in the two companion acts passed at the same time as chapter 11, *supra,* namely, chapter 8, known as the "Municipal Public Works Act of 1934," and chapter 9, known as "Cities and Towns Emergency Act of 1934," are provisions leaving municipalities unrestricted in determining what portion of the revenue arising from their utilities shall be devoted to the

creation of a special fund to satisfy the revenue bonds issued on it as security.

But while these various acts permit the pledging of the whole or any portion of the income from a utility to take care of the bonds and interest as they mature, section 7 of "the Revenue Bond Act" makes it the duty of the governing body of the municipality issuing the bonds to prescribe charges and revise them "from time to time whenever necessary so that any undertaking for which said bonds were issued shall constitute and always remain self-supporting with revenue sufficient to pay when due all bonds and interest thereon, for the payment of which such revenue is or shall have been pledged, encumbered or charged, to provide for all expenses of operation and maintenance, and to provide reasonable reserves for all of said purposes." And in the bonds themselves appears a provision in almost this identical language. So, it is clear that in authorizing the governing body of a municipality to set aside as a special fund whatever portion of the income from its utility is necessary to care for the bonds and interest thereon as well as to provide a reasonable reserve therefor, the effect of chapter 11, *supra,* is to require that this be done from what remains after the expenses of operation and maintenance are taken care of, that is, from the net income, a result that follows from the direction to the governing body that it shall at all times prescribe rates that will make the utility self-liquidating, namely, pay all operating and maintenance costs and, in addition, take care of the bonds and interest thereon as they become due.

If chapter 11 were silent as to whether the city would set aside a portion or all of the income from one of its utilities to take care of an improvement similar to the one here involved, it still would

have the right to use the part of it for this purpose it saw fit, because it is performing a proprietary and not a governmental function in operating its water system, and in that capacity it can do whatever an individual or private owner of such a plant might do.

The judgment is affirmed.

ROSS, J., concurs.

LOCKWOOD, C. J., Specially Concurring.—I am not satisfied with the reasoning of the cases relied on by the majority of the court in this case, although I recognize they represent the decided weight of authority. I realize, however, that so long as the majority adhere to the principles approved by them in *Board of Regents of University of Arizona* v. *Sullivan*, 45 Ariz. 245, 42 Pac. (2d) 619, the only logical and consistent conclusion to be drawn from those principles requires an affirmance of the present case. I therefore concur in the result solely on the doctrine of *stare decisis*.