623 P.2d 1239

**The CITY OF TUCSON, a municipal corporation, Plaintiff/Appellant,**

v.

**Robert K. CORBIN, Attorney General of the State of Arizona, Defendant/Appellee,**

**and**

**County of Pima, a body politic; Tucson Unified School District No. 1; and Pima County Community College District, Real Parties in Interest/Appellees.**

**2 CA–CIV 3626.**

Court of Appeals of Arizona, Division 2.

Dec. 17, 1980.

Rehearing Denied Jan. 21, 1981.

Review Denied Feb. 11, 1981.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P. A. by M. E. Rake, Jr. and Larry L. Smith, Phoenix, for plaintiff/appellant.

Robert K. Corbin, Atty. Gen. by Charles S. Pierson, Asst. Atty. Gen., Phoenix, for defendant/appellee.

Stephen D. Neely, Pima County Atty. by Rose Silver, Deputy County Atty., Tucson, for real party in interest/appellee, Pima County.

DeConcini, McDonald, Brammer, Yetwin & Lacy, P. C. by J. Wm. Brammer, Jr., Tucson, for real party in interest/appellee, Tucson Unified School District No. 1.

Stolkin & Weiss, P. C. by Ronald J. Stolkin, Tucson, for real party in interest/appellee, Pima County Community College District.

## OPINION

HATHAWAY, Chief Judge.

In this appeal, we are faced with the question of the constitutionality of Arizona's property tax increment financing scheme under the slum clearance and redevelopment law, A.R.S. Secs. 36–1471, et seq.

Our legislature has defined a method of redevelopment of slum or blighted areas within municipalities. After a finding of necessity has been made by the local governing body, a slum clearance and redevelopment commission may be formed to pre-

pare a redevelopment plan.[1] A municipality is given broad powers of eminent domain and disposal of property in a redevelopment project area.[2] Redevelopment projects may be financed by municipal bonds, and, since 1977, by property tax increment bonds.[3]

1. A.R.S. Secs. 36–1473, 36–1476, 36–1479.

2. A.R.S. Secs. 36–1478, 36–1480.

3. A.R.S. Sec. 36–1481 provides in part:
"Issuance of bonds
A. A municipality may issue bonds in its discretion to finance the undertaking of any redevelopment project under this article, including the payment of principal and interest upon any advances for surveys and plans for redevelopment projects, and may also issue refunding bonds for the payment or retirement of such bonds previously issued by it. Such bonds shall be made payable, as to both principal and interest, solely from the income, proceeds, revenues and funds of the municipality, including tax increment funds received pursuant to Sec. 36–1488.01, derived from or held in connection with its undertaking and carrying out of redevelopment projects under this article, ...
B. The bonds and other obligations of the municipality issued pursuant to subsection A of this section are not a general obligation or general debt of the municipality, the state or any of its political subdivisions, and neither the municipality, the state, nor any of its political subdivisions are generally liable for them, nor in any event shall the bonds or obligations give rise to a general obligation or liability of the municipality, the state or any of its political subdivisions, or a charge against their general credit or taxing powers, or be payable from any funds or properties other than those funds or properties specifically described in subsection A of this section and those bonds and obligations shall so state on their face. Bonds issued under this section shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction. Bonds issued under the provisions of this article are declared to be issued for an essential public and governmental purpose, and together with interest thereon and income therefrom, shall be exempted from all taxes."
A.R.S. Sec. 36–1488.01 provides in part:
"Property tax increment; redevelopment plans
A. In this section, unless the context otherwise requires:
1. 'Taxes' includes all levies on an ad valorem basis on land, real property, personal property or other property not otherwise exempted from such levies by the constitution or statutes of this state.
2. 'Taxing agency' means any city, including charter city, town, county or school district, including common school districts, unified school districts, high school districts and community college districts.

B. Any redevelopment plan may contain a property tax increment provision under which taxes, if any, levied upon taxable property in a redevelopment project area each year by or for the benefit of any taxing agency after the date the local governing body approves the redevelopment plan, including any amendments to such plan, incorporating property tax increment provisions, shall be divided as follows:
1. That portion of the taxes which would be produced, taking into account any credit or rebate against such tax levy or reduction in taxes to be collected, by the rate at which the tax is levied each year by or for each taxing agency upon the assessed value of the taxable property in the redevelopment project area as shown upon the assessment and tax roll used in connection with the taxation of such property by such taxing agency, last equalized prior to the date on which the local governing body approved the redevelopment plan, shall be allocated and when collected shall be paid into the funds of the respective taxing agencies as taxes by or for the taxing agencies on all other property are paid. For the purpose of allocating taxes levied by or for any taxing agency or agencies which did not include the territory in a redevelopment project area on the date of approval of the redevelopment plan by the local governing body, but to which such territory has been annexed or otherwise included after such date, the assessment and tax roll of the county last equalized on such date shall be used in determining the assessed valuation of the taxable property in the project area on such date.
2. That portion of the levied taxes each year in excess of such amount shall be allocated and when collected shall be paid into a special fund of the municipality to pay the principal of and interest on loans, monies advanced to or any indebtedness, incurred by such municipality to finance or refinance, in whole or in part, such redevelopment project. Unless and until the total assessed valuation of the taxable property in a redevelopment project area exceeds the total assessed value of the taxable property in such project area as shown by the last equalized assessment and tax roll referred to in paragraph 1 of this subsection all of the taxes levied and collected upon the taxable property in such redevelopment project area shall be paid into the funds of the respective taxing agencies. When such loans, advances and indebtedness, if any, and interest thereon, have been paid, all monies thereafter received from taxes upon the taxable property in such redevel-

The concept of tax increment financing originated in California in the early 1950's.[4] As a result of increasing difficulties in securing federal funding for redevelopment projects, use of this financing technique has increased, particularly over the last 10 years. Arizona's statutes are very similar to those of many other states which have adopted tax increment financing. These statutes do not require voter approval prior to issuance of tax increment bonds.

In a typical project utilizing tax increment financing, the redeveloping municipality finances its activities by issuing bonds to be repaid from future tax increments for the duration of the project. The assessed valuation of the property within the redevelopment area is determined as of a particular date. This is referred to as the "frozen base value" or "base year assessed value." After the bonds are sold and redevelopment occurs, the assessed valuation of the project property generally rises, which results in additional ad valorem tax revenues from that area. The difference in revenues received before and after the redevelopment, the "tax increment," is paid into a special fund and applied to repayment of the tax increment bonds. Only revenues above and beyond what would have been collected from the property owners under the base year assessed valuation are diverted into the repayment fund. When the bonds are fully repaid from the captured increments, the allocation to the special fund terminates and the full taxes are disbursed to the respective taxing authorities.[5]

In October 1977, the Tucson City Council adopted Resolution No. 10347, authorizing the issuance of $1.5 million of tax increment bonds for the Pueblo West Redevelopment Project. Pursuant to A.R.S. Sec. 36–1484, the proposal was submitted to the attorney general for certification. The attorney general refused to certify the bonds, stating that "the bonds authorized by the City for issue would not be issued in accordance with the Constitution and laws of the State of Arizona." The attorney general listed 12 reasons for his conclusion.

The city then filed the instant action against the attorney general and the three other taxing authorities affected,[6] requesting a special order directing the attorney general to certify that the Pueblo West tax increment bonds could be issued. The trial court ruled that the bonds were invalid and that the tax increment statutes adopted by the legislature were unconstitutional as creating a debt without an election in violation of Ariz.Const. art. 7, Sec. 13, as well as creating a "new tax" in violation of sections 3, 6 and 9 of article 9 and section 13 of article 4, part 2. To facilitate appeal, the trial court ruled in favor of the attorney general on all the remaining issues.

Ariz.Const. art. 7, Sec. 13 provides:
"Submission of questions upon bond issues or special assessments
Questions upon bond issues or special assessments shall be submitted to the vote of real property tax payers, who shall also in all respects be qualified electors of this State, and of the political subdivisions thereof affected by such question."

---

opment project area shall be paid into the funds of the respective taxing agencies as taxes on all other property are paid."

4. Cal.Health & Safety Code Sec. 33670 (West 1973).

5. "This overall process provides local governments with a flexible funding source for redevelopment activity that avoids much of the red-tape and delay associated with grant programs. In some states, TIF [tax increment financing] also avoids the constraints of voter approval and municipal borrowing or debt limitations. However, these advantages in administrative flexibility and circumventing local political pressure creates greater potential for abuse by redevelopment officials, particularly when projects appear economically feasible without such public assistance. (Footnotes omitted)" Davidson, "Tax Increment Financing as a Tool for Community Redevelopment," 56 U.Det.J.Urb.L. 405, 408 (1978). See also, Note, "Urban Redevelopment: Utilization of Tax Increment Financing," 19 Washburn L.J. 536 (1980).

6. Appellees Pima County, Tucson Unified School District No. 1 and Pima County Community College District took no active part in the case below and have filed no answering briefs in this court. All three parties have agreed to abide by the decision of this court on the briefs submitted.

The question before us is whether the issuance of property tax increment bonds constitutes a debt of the city which "affects" it, requiring an election under this provision.

It has long been established that a municipality is not affected by a bond issue or special assessment when it in no way incurs liability for payment. *City of Globe v. Willis*, 16 Ariz. 378, 146 P. 544 (1915). For this reason, municipal revenue bonds or obligations payable out of a special fund separate from the city's general funds do not require an election before they may be issued, and are not affected by constitutional restrictions on municipal indebtedness. *Guthrie v. City of Mesa*, 47 Ariz. 336, 56 P.2d 655 (1936). The city contends that tax increment bonds fall into the category of revenue or special fund obligations described in *Willis* and *Guthrie*. It points out that the tax increment statutes provide that such bonds shall not give rise to a general obligation or liability of the municipality and "shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction." [7] Further, the city argues, the tax increments are placed in a special fund to pay off the bonds and that the only obligation undertaken by the city is to collect and pay over the incremental tax revenues, if any, resulting from any increased valuation within the redevelopment project area. We agree that under the statutory scheme the city's general funds would not be liable even in the event that no incremental tax revenues are ever collected. The parties stipulated below and it appears uncontradicted that ad valorem taxation presently affects the property in question, that the probabilities are that such taxation will continue to exist in the future, and that the fair market value of the property will probably increase in the future.

Notwithstanding the legislature's recital that tax increment bonds do not constitute a debt within the meaning of Ariz. Const. art. 7, Sec. 13, we must look to the transaction for what it is, and not what it is called. *City of Phoenix v. Phoenix Civic Auditorium & Convention Center Ass'n*, 99 Ariz. 270, 408 P.2d 818 (1965), reh. 100 Ariz. 101, 412 P.2d 43 (1966). The *Phoenix Civic Auditorium* opinions are particularly instructive on the issue before us. In that case, a lease-back agreement under which the City of Phoenix was to condemn land and lease it to a nonprofit association, which would construct a civic center and rent the land back to the city, was held to create a debt upon the city exceeding the constitutional debt limitation. The supreme court stated that the issuance of bonds which are not payable from general funds but solely from revenues of an independent revenue-producing asset or utility does not constitute a debt of the municipality, but that the lease-back terms amounted to a purchase agreement which made "the general taxing power of the City" the real "security for the debts." On rehearing, the court held that if the lease was amended to provide that the proceeds of ad valorem taxes could not be subjected to payment of rent, the lease would not violate the Arizona Constitution.

The key constitutional infirmity in Arizona's tax increment statutes is that they allow the pledge of proceeds from ad valorem taxation to pay off municipal property tax increment bonds. Even though the incremental tax revenues are placed into a special fund, the "special fund" doctrine of *City of Globe v. Willis*, supra, and *Guthrie v. City of Mesa*, supra, does not remove these bonds from the category of obligations which must be approved by the voters under our constitution. Our supreme court has addressed the special fund doctrine by quoting at length from a Washington Supreme Court opinion, *State ex rel. Washington State Finance Committee v. Martin*, 62 Wash.2d 645, 384 P.2d 833 (1963):

" 'That the special fund doctrine is a useful and valid tool of government is apparent when one thinks of all of the institutions and devices of government supported by it. But the true test of its

---

7. A.R.S. Sec. 36–1481(B). See footnote 3, supra.

application here is not what comes out of the fund, but what goes into it. If the revenues in it derive exclusively from the operation of the device or organ of government financed by the fund, as in the case of a toll bridge, or the operation of the State Liquor Control Board, or from sales or leases of publicly owned lands, any securities issued solely upon the credit of the fund are not debts of the state, but debts of the fund only. But if the state undertakes or agrees to provide any part of the fund from any general tax, be it excise or ad valorem, then securities issued upon the credit of the fund are likewise issued upon the credit of the state and are in truth debts of the state. Hence, we must take care that the employment of peripheral doctrines do not lead us away from the main point of the case. What is a debt of the State of Washington? Any obligation which must in law be paid from any taxes levied generally is, we think, a debt of the state. It matters little whether the tax be ad valorem or an excise.'

\*   \*   \*   \*   \*   \*

We agree with the Washington court that where the bonds are payable only from a constitutionally authorized fund, which is separate and distinct from the State's general revenues, the bonds thus funded are obligations of the special fund and not of the state." *Arizona State Highway Commission v. Nelson*, 105 Ariz. 76, 80, 459 P.2d 509, 513 (1969).

See also, *Tucson Transit Authority, Inc. v. Nelson*, 107 Ariz. 246, 485 P.2d 816 (1971).

Despite the presumption in favor of the constitutionality of a legislative enactment and our duty to view any attack in favor of the validity of the statute, *New Times, Inc. v. Arizona Board of Regents*, 110 Ariz. 367, 519 P.2d 169 (1974), we are constrained to hold that the provisions of our slum clearance and redevelopment law which authorize tax increment financing in its current form are unconstitutional as violative of Ariz.Const. art. 7, Sec. 13. The Supreme Court of Kentucky reached the same result in *Miller v. Covington Development Authority*, 539 S.W.2d 1 (Ky.1976), stating that ad valorem taxes cannot be put in the "special fund" category, and that any obligation payable from ad valorem taxes is a debt. The Supreme Court of Iowa, while holding that state's tax increment statutes constitutional on due process and other grounds, also held that property tax increment bonds must be treated as a municipal debt obligation:

"The purpose of Sec. 3 [Iowa's constitutional debt limitation, similar to Ariz. Const. art. 9, § 8], as indicated by the special assessment and revenue bond cases, is to prevent the general taxes of a political subdivision from becoming overburdened by obligations. The taxes which will be used to pay the proposed urban renewal bonds and interest will be general taxes. This is not a case of a special assessment tax which was never intended to be used, and could not be used, to meet other expenses of the city. Nor is this a case where the bonds are to be paid from the operating revenues of a municipal enterprise which generates income, such as a power plant.

Ultimately the 'credit' of a city is its power to levy general taxes. When it pledges all or part of that power, it pledges its credit and in a realistic sense incurs an obligation. We think the bonds must realistically be treated as a debt for the purposes of Sec. 3.

Clearly the urban renewal bonds would constitute a constitutional debt if they were payable from the general revenues of the city without limitation. We think the result is not different because Sec. 403.19 carves out a certain portion of a city's general revenues and limits the liability of the city to those revenues. If the result were otherwise, a city could divide its general revenues into several special funds, each with a bond issue restricted to recourse against its own fund—and thus commit large portions of the city's revenues without regard to Sec. 3. The constitutional debt limitation could thus be virtually nullified." *Richards v. City of Muscatine*, 237 N.W.2d 48, 64 (Iowa 1975)

We perceive another reason why an election must be held in this instance. The electors of the affected district shall be given a voice in accepting or rejecting a proposed expenditure which ultimately pledges their district's general taxing power. An election is required even if the proposed increase in indebtedness would not violate constitutional debt limitations. *Ackerman v. Boyd*, 74 Ariz. 77, 244 P.2d 351 (1952); see also, *Tribe v. Salt Lake City Corp.*, 540 P.2d 499 (Utah 1975) (Henriod, C. J., dissenting).

We have reviewed the tax increment statutes of other jurisdictions together with case law interpreting these provisions and find no authority which dictates a different conclusion. The majority of these statutes have not been attacked on constitutional grounds in their respective jurisdictions. It is significant to note that California, the state which first adopted tax increment financing, amended its constitution to allow such financing in the face of its debt limitation provisions. Cal.Const. art. 16, Sec. 16.

The trial court correctly declared the instant bond issue invalid and the tax increment financing scheme set forth in A.R.S. Secs. 36–1481 and 36–1488.01 unconstitutional under Ariz.Const. art. 7, Sec. 13. We do not address the additional objections raised by counsel since the statutes do not survive this initial constitutional barrier.

Affirmed.

HOWARD and RICHMOND, JJ., concur.