53 P.3d 172

John F. LONG, Plaintiff Appellant,
Cross Appellee,

v.

Janet A. NAPOLITANO, Attorney General of the State of Arizona; Carol Springer, Treasurer of the State of Arizona; Tourism and Sports Authority, a political subdivision of the State of Arizona; F. Rockne Arnett; John Benton; James Grogan; C.A. Howlett; Denise Merideth; Kate Monahan; Herman Orcutt; William Peltier; and Rod Williams, Members of the Board of Directors of the Tourism and Sports Authority, Defendants–Appellees,

Richard M. Romley, Maricopa County Attorney, Defendant–Appellee, Cross Appellant,

and

City of Tempe, a municipal corporation; City Of Surprise, a municipal corporation; B & B Holdings, Inc.; The Fiesta Bowl; Texas Rangers Baseball Partners; and The Valley Hotel and Resort Association, Intervenors Defendants–Appellees.

No. 1 CA–CV 02–0036.

Court of Appeals of Arizona, Division 1, Department C.

Aug. 27, 2002.

Review Denied Dec. 3, 2002.

Cohen, Kennedy, Dowd & Quigley, PC By Ronald Jay Cohen, Laura H. Kennedy, Brown & Bain, P.A. By Paul F. Eckstein, Joel W. Nomkin, Jessica L. Everett–Garcia, Rebecca K. Barnes, Phoenix, Attorneys for Plaintiff–Appellant, Cross Appellee.

Janet Napolitano, Attorney General By Patrick Irvine, Solicitor General, Mary O'Grady, Assistant Attorney General, Phoenix, Attorneys for Defendant–Appellee Napolitano.

Richard M. Romley, Maricopa County Attorney By Christopher C. Keller, Chief Counsel, Jean W. Rice, Deputy County Attorney, Bruce P. White, Deputy County Attorney, Phoenix, Attorneys for Defendant–Appellee, Cross Appellant.

Osborn Maledon, P.A. By William J. Maledon, David G. Campbell, John L. Blanchard, Taylor C. Young, Fennemore Craig, P.C. By Kendis K. Muscheid, Lee D. Stein, Phoenix, Attorneys for Defendants–Appellees Tourism and Sports Authority; C. Rockne Arnett; John Benton; James Grogan; C.A. Howlett; Denise Merideth; Kate Monahan; Herman Orcutt; William Peltier; and Rod Williams, Members of the Board of Directors of the Tourism and Sports Authority.

Grant Woods, P.C. By Grant Woods, Phoenix, Attorneys for Defendant Intervenor–Appellee City of Tempe.

City of Surprise Attorney's Office By Mr. Bruce C. Smith, Surprise, Attorneys for Defendant Intervenor–Appellee City of Surprise.

Gallagher & Kennedy, P.A. By Michael K. Kennedy, Phoenix, Attorneys for Defendant Intervenor–Appellee B & B Holdings, Inc.

Snell & Wilmer, L.L.P. By Patrick G. Byrne and Todd Feltus, Phoenix, Attorneys for Defendant Intervenor–Appellee Fiesta Bowl.

Lewis & Roca, LLP By W. Scott Bales, Phoenix, Attorneys for Defendants Intervenors–Appellees Texas Rangers Baseball Partners and The Valley Hotel and Resort Association.

## OPINION

TIMMER, Presiding Judge.

¶ 1 We are asked to decide whether legislation creating and implementing the Tourism and Sports Authority ("TSA"), Ariz.Rev. Stat. ("A.R.S.") §§ 5–802 to –877 (Supp. 2001), is an unconstitutional special law favoring only Maricopa County. We must further determine whether the TSA funding mechanism violates the constitutional debt limitation. For the reasons that follow, we hold that the TSA legislation is not a prohibited special law and does not violate the debt limitation established by our constitution. However, we sever the language from A.R.S. § 5–866(1) and (2) that authorizes the TSA to pledge "all" revenues and monies received by it to pay and secure bond obligations.

## BACKGROUND

¶ 2 In May 1999, the voters in the City of Mesa rejected a development proposal that included construction of a football stadium. In response, Governor Jane Dee Hull formed a 35 member "Stadium Plan 'B' Advisory Task Force" to explore funding options for a new football stadium. The Governor believed that "[s]uch a facility may be necessary to retain Arizona's NFL franchise, to be placed on a regular rotation for future Super Bowls, and to keep the Fiesta Bowl as one of the premier collegiate bowl games in the country, all of which have a major economic impact on our state." The Governor directed the task force to research the need for a new stadium, assess its economic impact and devise a possible funding package. She asked that any public financing minimize the impact on the average citizen, particularly those who choose not to support professional sports.

¶ 3 In January 2000, the task force issued its final report entitled "Arizona Tourism Retention and Promotion," which set forth the following pertinent findings:

1. Arizona is threatened with the loss of significant revenues and status if the Arizona Cardinals are forced to relocate. Since moving to Arizona in 1988, the Cardinals franchise has had an estimated $150 million per year economic impact on the state. In addition, nationally televised Cardinals home games have promoted tourism in Arizona by displaying scenic views of Arizona that would cost the state millions of dollars if it had to purchase the same amount of media exposure. Several states have built or are building new stadiums to retain their teams or to entice NFL teams to relocate to their communities. Cities that have lost their NFL franchise have spent an average of $1 billion to obtain another one.

2. The Fiesta Bowl's status as a top-tier bowl game is threatened by new stadiums across the country. As a member of the Bowl Championship Series ("BCS"), the Fiesta Bowl creates an enormous economic impact for the state. For example, the 1999 Fiesta Bowl had a $133 million impact on the state's economy. Fiesta Bowl officials expressed a fear of losing BCS status if the annual game cannot move to a new stadium.

3. Absent a new stadium, Arizona has "virtually no chance" of hosting the Super Bowl on a recurring basis. The 1996 Super Bowl held in the City of Tempe created an economic impact of $305 million in Arizona.

¶ 4 On the basis of these findings, the task force concluded that a new stadium was a good investment for the state. In the course of developing a proposed funding package for the stadium, the task force learned of two

additional threats to Arizona's tourism tax base:

1. Other states, Las Vegas, and other local destination marketing agencies are systematically outpacing Arizona in tourism promotion. An aggressive increase in tourism budgets nationwide reduced Arizona's tourism market share in 1997 and 1998 by approximately $800 million in direct tourist spending. Las Vegas has adopted a $100 million per year multimedia campaign to attract visitors, proclaiming itself the leading vacation destination in the Southwest and effectively "stealing" the Grand Canyon as a result of its efforts. Armed with only a $6 million annual tourism promotion budget, Arizona is in danger of continuing to lose its market share.

2. The future of the Cactus League is threatened by competition from well-funded cities. The visitor spending associated with Cactus League game attendance has produced approximately $200 million annually. In addition to competing for teams playing in Florida's Grapefruit League, Arizona is also competing with Las Vegas, which is attempting to lure teams to that city. Although many Cactus League facilities need renovations, funds will not be available for such projects until 2017, which may lessen Arizona's chances for retaining and attracting teams.

¶ 5 As a result of these additional threats to the state's tourism tax base, the task force broadened its mission to include the protection and promotion of Arizona's tourism industry and Cactus League. The task force then recommended a capital funding plan, which included formation of a "Tourism and Sports Retention Authority" and assessment of a state-wide hotel tax and Maricopa County car rental surcharge.

¶ 6 Following the task force's recommendations, Senate Bill 1220 was placed before the legislature in March 2000, and the TSA legislation passed the next month. The boundaries of the TSA are "the boundaries of any county that has a population of more than two million persons." A.R.S. § 5-802(A). Because Maricopa County is the only county in Arizona with a population exceeding two million people as of April 2000

and through the date of this decision, the TSA operates only in that county.

¶ 7 The TSA is required to acquire land and finance, construct, operate, and promote a multipurpose sport and event facility, 2002 Ariz. Sess. Laws, ch. 288, § 1(4); A.R.S. § 5-807(A), which must be "suitable to be used to accommodate professional football franchises, major college football bowl sponsors" and other civic uses. ch. 288, § 1(4). The TSA is authorized to fund the multipurpose facility by issuing bonds. A.R.S. § 5-862(A). The multipurpose facility is additionally funded by monies paid by the Arizona Cardinals and other entities for use of the multipurpose facility, A.R.S. §§ 5-833(A)(1), -834(A), and, upon approval by the voters residing within the TSA, monies collected as local surcharges on car rentals and a local one percent tax on hotel rooms. A.R.S. §§ 5-839, -840. Finally, the TSA legislation diverts specified transaction privilege taxes and income taxes to fund the multipurpose facility. A.R.S. §§ 42-1116(C), -5032.01 (Supp.2001); A.R.S. § 43-209 (Supp.2001).

¶ 8 The TSA may also fund promotion of tourism within its borders, A.R.S. § 41-2306(A)(2) (Supp.2001), and build, finance or improve both major league baseball spring training facilities, A.R.S. § 5-808(A)(1), and community youth and amateur sports facilities located within the TSA. A.R.S. § 5-809(A)(1). These undertakings are financed by monies remaining from the car rental surcharges and hotel taxes after payment of debt service on TSA-issued bonds for the construction of the multipurpose facility. A.R.S. §§ 5-834, -835. The TSA may also fund the spring training "Cactus League" projects by issuing bonds. A.R.S. § 5-837(C).

¶ 9 The TSA legislation required the TSA and Maricopa County to call an election not later than August 1, 2000 to seek the voters' approval to levy the car rental surcharge and hotel tax to be used to partially fund the TSA. 2000 Ariz. Sess. Laws, ch. 372, § 16(A)(1), (2). If a majority of voters had rejected the measure, the TSA legislation would have been automatically repealed. *Id.* at § 19(1). However, at an election held in

November 2000, the majority of voters in Maricopa County approved Proposition 302, which authorized the local car rental surcharge and hotel tax.

¶ 10 In September 2001, John F. Long filed a special action in the superior court challenging the TSA legislation as an unconstitutional "special law" that benefits only Maricopa County, Ariz. Const. art. 4, pt. 2, § 19(20), and as establishing a funding mechanism in violation of the constitutional debt limitation, Ariz. Const. art. 9, § 5. Long asked the court to issue orders (1) compelling the Arizona Attorney General and the Maricopa County Attorney to initiate legal action against the TSA and its board members to prevent them from exercising the authority conferred by the TSA legislation, (2) prohibiting the State Treasurer from transferring tax monies to the TSA, and (3) prohibiting the TSA and its board members from spending or pledging public funds.

¶ 11 In November, the superior court ruled that Long's claims were barred by the equitable doctrine of laches because he had unreasonably delayed in filing his lawsuit to the significant prejudice of the TSA and other parties. Notwithstanding its ruling, the court then addressed the merits of Long's claims and concluded that the TSA legislation did not violate any constitutional provision. After the denial of post-ruling motions, Long filed this appeal. The Maricopa County Attorney filed a cross-appeal, challenging the superior court's denial of a motion to dismiss Long's petition for reasons unrelated to laches or the merits of Long's contentions. Because we affirm, we do not address the cross-appeal issues.

## DISCUSSION

¶ 12 We will affirm the judgment if correct on the merits of Long's claims, even though the superior court based its ruling on the doctrine of laches. *See Rowland v. Great States Ins. Co.,* 199 Ariz. 577, 581–82, ¶ 6, 20 P.3d 1158, 1162–63 (App.2001) (holding court will affirm if ruling correct on any ground). Because we conclude that the TSA legislation is constitutional, and to resolve these important public issues on their merits, we do not

consider whether the court correctly decided that laches barred Long's petition.

## I. Special law

¶ 13 Long first argues that the TSA legislation violates the "special law" provision of our constitution, which states in pertinent part, that "[n]o local or special laws shall be enacted ... [w]hen a general law can be made applicable." Ariz. Const. art. 4, pt. 2, § 19(20). A "special law" confers rights and privileges on particular members of a class or to an arbitrarily drawn class that is not rationally related to a legitimate governmental purpose, while a "general law" applies to all persons of a reasonably defined class. *State Comp. Fund v. Symington,* 174 Ariz. 188, 192, 848 P.2d 273, 277 (1993). Our constitution forbids special laws to prevent the legislature from bestowing benefits on favored groups or localities while ignoring others who are similarly situated. *Id.*

¶ 14 The special law ban does not prohibit the legislature from enacting laws that confer privileges only on a population-based class, as long as the classification is a rational one. *Id.* at 192–93, 848 P.2d at 277–78; *Ariz. Downs v. Ariz. Horsemen's Found.,* 130 Ariz. 550, 555, 637 P.2d 1053, 1058 (1981) ("It is not unconstitutional ... for the state to treat different classes of people in varying ways."). The supreme court has adopted a three-part test to determine whether such class-based laws pass constitutional muster. Legislation does not violate the special law prohibition if (1) the classification is rationally related to a legitimate governmental objective, (2) the classification is legitimate, encompassing all members of the relevant class, and (3) the class is elastic, allowing members to move in and out of it. *Republic Inv. Fund I v. Town of Surprise,* 166 Ariz. 143, 149, 800 P.2d 1251, 1257 (1990) (citing *Petitioners for Deannexation v. City of Goodyear,* 160 Ariz. 467, 472, 773 P.2d 1026, 1031 (1989)).

¶ 15 Long contends that the TSA legislation fails the first and third prongs of this test and that the superior court therefore erred by declaring the statutory scheme constitutional. Because the constitutionality of the TSA legislation is a question of law, we

review the superior court's ruling de novo. *Little v. All Phoenix S. Cmty. Mental Health Ctr., Inc.*, 186 Ariz. 97, 101, 919 P.2d 1368, 1372 (App.1995). We will declare the TSA legislation unconstitutional only if we are satisfied beyond a reasonable doubt that the Act conflicts with our state constitution. *Chevron Chem. Co. v. Superior Court*, 131 Ariz. 431, 438, 641 P.2d 1275, 1282 (1982).

¶ 16 In considering Long's challenge, we bear in mind certain well-accepted principles. First, we must construe the TSA legislation, if possible, to give it a reasonable and constitutional meaning. *State Comp. Fund*, 174 Ariz. at 193, 848 P.2d at 278. Second, a strong presumption exists that the Act is constitutional. *Id.* In doubtful cases, we will generally defer to legislative determinations of policy. *Republic Inv. Fund*, 166 Ariz. at 148, 800 P.2d at 1256. Finally, in recognition of the legislature's lawmaking role, we will ordinarily defer to its decisions about whether a general law will apply. *Id.* at 147–48, 800 P.2d at 1255–56.

## 1. Rational relationship of classification to legitimate governmental objective

¶ 17 The TSA legislation satisfies the first prong of the special law test if the classification scheme is rationally related to a legitimate governmental purpose. *State Comp. Fund*, 174 Ariz. at 193, 848 P.2d at 278. The parties agree that the legislature defined the class affected by the TSA legislation as counties with a population of two million or more people. Thus, after identifying the legislature's legitimate purpose for enacting the TSA legislation, we must decide if the population-based classification has "any conceivable rational basis" to further that purpose. *Ariz. Downs*, 130 Ariz. at 555, 637 P.2d at 1058.

¶ 18 Based upon its review of legislative history, the superior court found that the legislature's primary objective in creating the TSA was to retain the Arizona Cardinals football franchise in the state by constructing a multipurpose stadium. The court further concluded that the legislature secondarily intended to promote tourism, support the Cactus League, and improve youth and amateur sports facilities within the TSA boundaries. Because the legislature could have rationally determined that only a county with a very large population could support a professional football stadium, and the secondary purposes cannot be separated from the primary objective, the court ruled that the TSA legislation passed the "rational relationship" prong of the special law test.

¶ 19 Long first argues that the court erred in its analysis because the four stated purposes of the TSA legislation are co-equal and, therefore, the classification must be rationally related to each of these objectives standing alone in order to withstand a special law challenge. The TSA and the Attorney General counter that the stated purposes of the TSA legislation are not co-equal because the legislature chiefly sought to build a state-of-the-art football stadium. Consequently, they contend that if the population-based classification is rationally related to that objective alone, the TSA legislation satisfies the first prong.

¶ 20 We agree with Long that the classification must be rationally related to each objective of the TSA legislation in order for the entire statutory scheme to survive a special law challenge. Otherwise, a prohibited special law could withstand attack by mere placement within constitutionally permissible legislation. Such a result would permit the legislature to bestow benefits on preferred groups while ignoring those who are similarly situated, in contravention of the special law prohibition. *State Comp. Fund*, 174 Ariz. at 192, 848 P.2d at 277. We will therefore uphold the TSA legislation in its entirety only if the population-based classification is rationally related to each objective of the Act. *See id.* at 195, 196, 848 P.2d at 280, 281 (declaring entire statute a prohibited special law because one of two objectives not rationally related to legitimate governmental purpose and unconstitutional provision not severable). We consider each objective in turn.

### (a) Multipurpose facility

¶ 21 Long asserts that the population-based classification is not rationally related to the construction of a multipurpose

facility because counties of every size would benefit from such a structure. While Long does not contest that the classification is rationally related to the construction of a professional football stadium, he contends that the superior court erred in upholding the TSA legislation on that basis because erection of a stadium is optional under the definition of "multipurpose facility." *See* A.R.S. § 5–801(3) (Supp.2001) (defining "multipurpose facility" as "any facility that is suitable to be used to accommodate sporting events and entertainment, cultural, civic, meeting, trade show or convention events or activities and may include a stadium."). The TSA counters that other provisions within the TSA legislation, its origins within the task force's report, and language utilized in the publicity pamphlet concerning Proposition 302, evidence the legislature's intention to construct a multipurpose facility that would serve as a venue for professional and collegiate football contests.

¶ 22 To determine legislative intent, we first review a statute's language. *Calmat of Ariz. v. State ex rel. Miller*, 176 Ariz. 190, 193, 859 P.2d 1323, 1326 (1993). Although the legislature's original definition of "multipurpose facility" stated that the structure "may" be a stadium, we agree with the TSA that other provisions within the legislation reflect that the facility must be capable of serving as a venue for professional and collegiate football games. The legislation indicates that the facility will cost more than $300 million, A.R.S. § 5–835(B)(1), and will be built by "contractors with experience in stadium design or construction." A.R.S. § 5–807(C). The facility is partially funded by payment of $85 million by the professional football franchise that will regularly use the venue, 2000 Ariz. Sess. Laws, ch. 372, § 15(1), diversion of income taxes paid by specified professional football franchises and their employees, A.R.S. § 42–1116(C); A.R.S. § 43–209, and state transaction privilege taxes associated with professional football games played at select college stadiums. A.R.S. § 42–5032.01(B).

¶ 23 Our examination of the history and context of the TSA legislation also supports the conclusion that the legislature intended that the multipurpose facility be used as a venue for professional and collegiate football games. *See Estancia Dev. Assocs., L.L.C. v. City of Scottsdale*, 196 Ariz. 87, 90, ¶ 11, 993 P.2d 1051, 1054 (App.1999) (holding court may consider statute's context, historical background, spirit and purpose in deciding meaning that is uncertain). The TSA legislation sprung from the task force's recommendation to publicly finance, own and operate a state-of-the-art football stadium in order to retain the Arizona Cardinals franchise within the state, continue to host BCS bowl games, and host future Super Bowl games. *See supra* ¶¶ 3–5. Additionally, the Proposition 302 publicity pamphlet distributed to Maricopa County voters stated that the "multi-purpose stadium facility will be the home of the Arizona Cardinals, the Tostitos Fiesta Bowl, and, possibly, future Super Bowls."

¶ 24 Finally, since initiation of this appeal, the legislature has clarified its intention by amending the definition of "multipurpose facility" to require that any facility be "suitable to be used to accommodate professional football franchises [and] major college football bowl sponsors." Ch. 288, § 1(4). *See City of Mesa v. Killingsworth*, 96 Ariz. 290, 297, 394 P.2d 410, 414 (1964) (citations omitted) ("An amendment which, in effect, construes and clarifies a prior statute will be accepted as the legislative declaration of the original act.").

¶ 25 Based on all these factors, we decide that the legislature intended that the TSA construct and operate a stadium that can serve as a venue for professional and BCS football games. Because the success of such major sporting events depends on large crowds and a host community that has amenities such as a large airport and a large number of hotels and restaurants, we hold that the population-based classification used in the TSA legislation is rationally related to construction and operation of a multipurpose facility. *See Libertarian Party of Wis. v. State*, 199 Wis.2d 790, 546 N.W.2d 424, 431–32 (1996) (holding population criteria rationally promoted legitimate legislative objective of creating professional baseball stadium district in light of demographic, economic and population characteristics necessary to sup-

port Major League Baseball club); *CLEAN v. State*, 130 Wash.2d 782, 928 P.2d 1054, 1064 (Wash.1996) (deciding rational basis exists to limit major sports stadium to highly populated counties).

### (b) Non-stadium objectives

¶ 26 Long next argues that the population-based classification is not rationally related to the legitimate governmental objectives of promoting tourism and building, financing and improving both Cactus League and community youth and amateur sports facilities because all counties would benefit from these undertakings. We reject Long's contention for two reasons.

¶ 27 First, Long's application of the rational relationship test is unduly restrictive. The legislature is not constrained from enacting class-based legislation merely because non-members of the class would also derive some benefit from the legislation. Rather, the legislature is proscribed from bestowing benefits on favored groups or localities while ignoring others *who are similarly situated. State Comp. Fund,* 174 Ariz. at 192, 848 P.2d at 277. As held by our supreme court, "the legislature must enact laws that apply to all individuals who may benefit from its attempt to remedy a particular evil." *Republic Inv. Fund,* 166 Ariz. at 149, 800 P.2d at 1257.

¶ 28 Second, we conclude that counties with populations less than two million people are not similarly situated to more populous counties for purposes of remedying the "particular evils" addressed by the non-stadium objectives of the TSA legislation. We agree with the TSA that the legislature passed the non-stadium objectives to counter threats to Arizona's tourism industry and Cactus League flowing from campaigns waged by Las Vegas and other out-of-state communities. *See supra* ¶ 4. The legislature could have rationally decided that promotion of the non-stadium objectives in Arizona's most populous county was necessary to effectively stem increased competition from comparable major metropolitan areas outside Arizona, to the benefit of the entire state.

¶ 29 For example, increased tourism promotion in Maricopa County, the only current member of the TSA class, could repel Las Vegas' efforts to market itself as the premier golf and resort community in the Southwest. Similarly, improving Cactus League facilities in the Phoenix metropolitan area, which hosts most of the teams in that league, would stave off efforts by Las Vegas to lure Major League Baseball franchises to its community and establish a spring training league. Finally, construction and improvement of youth and amateur sports facilities in Maricopa County, with its international airport, numerous hotels and restaurants, would enable it to compete with similarly populated communities for large-scale youth sports tournaments that draw thousands of visitors.[1]

¶ 30 Additionally, counties with populations less than two million people are not similarly situated to more populated counties in terms of their respective abilities to finance the non-stadium objectives.[2] Arizona's general funds are not used to promote tourism or build, finance or improve Cactus League and community youth and amateur sports facilities within the TSA. Instead, these objectives are funded by monies received from the car rental surcharge and hotel tax imposed within the TSA after payment of debt service associated with the multipurpose facility.[3]

---

1. Long presented evidence to the superior court of the economic impact on communities from hosting youth soccer tournaments. According to a survey, 4,500 to 15,000 visitors attended seven-day tournaments in seven communities in the Western United States from 1996 through 2000. The estimated economic impact from these tournaments ranged from $1.0 million to $7.9 million. According to the publicity pamphlet concerning Proposition 302, the construction of youth and amateur sports facilities is expected to generate approximately $4.4 million annually in economic activity.

2. Although Appellees did not raise this argument, we are not constrained from addressing it. *See Evenstad v. State,* 178 Ariz. 578, 582, 875 P.2d 811, 815 (App.1993) ("[W]hen we are considering the interpretation and application of statutes, we do not believe we can be limited to the arguments made by the parties if that would cause us to reach an incorrect result.").

3. Monies generated by the car rental surcharge and hotel tax are used in the following order of priority after payment of the debt service associated with the multipurpose facility: (1) promotion of tourism, (2) construction, financing

A.R.S. §§ 5–808(A), 809(A), –835, –837, –838, –839(G), –840(E); A.R.S. § 41–2306(A)(2). Absent the TSA legislation, counties with populations greater than two million people are substantially restricted from funding the non-stadium objectives. Conversely, less populous counties and communities have other means to accomplish these undertakings.

#### (i) *Tourism*

¶ 31 Immediately after passing the TSA legislation, the legislature enacted A.R.S. § 42–6108.01 (Supp.2001), which applies only to counties with populations less than two million and more than 500,000.[4] 2000 Ariz. Sess. Laws, ch. 375, § 6. Under this provision, upon majority vote at a county-wide election, affected counties may levy a tax on hotels to be used entirely for promotion of tourism within that county. A.R.S. § 41–2306(A)(3); A.R.S. § 42–6108.01(A). *See also* A.R.S. § 42–6108 (1999) (authorizing board of supervisors in county with less than 1.5 million but more than 500,000 persons to levy hotel tax for use, in part, to promote and enhance tourism in county).

¶ 32 Moreover, cities and towns with populations of 100,000 persons or less may impose additional license fees and transaction privilege taxes on hospitality industry businesses to promote tourism within those communities. A.R.S. §§ 9–500.06(E), –500.11 (1996). The legislature denied this benefit to larger municipalities in order to protect Arizona's tourism industry from the levy of unfair and adverse taxes and fees. 1990 Ariz. Sess.

Laws, ch. 303, § 1. The TSA legislation enables affected counties to fund promotion of tourism within larger metropolitan communities, which are otherwise prohibited from financing such ventures by taxing the hospitality industry. A.R.S. § 9–500.06.

#### (ii) *Cactus League*

■ ¶ 33 Any county with a population greater than 1,500,000 persons or any county in which a Major League Baseball franchise has established or seeks to establish a spring training operation may organize a county stadium district. A.R.S. § 48 4202(A) (Supp. 2001). Under specified circumstances, such districts may assess transaction privilege taxes, impose car rental surcharges, issue bonds and use other monies to acquire land and construct, finance, operate and promote Major League Baseball franchise stadiums. A.R.S. § 48–4204 (Supp.2001). Thus, contrary to Long's assertion, all counties hosting Cactus League teams, and those in which a baseball franchise seeks to establish a spring training facility, can use virtually the same funding mechanisms as those provided in the TSA legislation.[5]

#### (iii) *Youth and Amateur Sports*

¶ 34 The legislature has authorized counties with populations less than two million people to levy transaction privilege taxes "for capital projects and to purchase, construct and lease buildings, structures, facilities, roads, highways and other real and personal property ... for the use or benefit of the county." [6] A.R.S. § 42–6111 (Supp.2001).

---

and improvement of Cactus League facilities, (3) financing and improvement of youth and amateur sports facilities, (4) funding the TSA operating account construction. 2002 Ariz. Sess. Laws, ch. 288, § 8.

4. Currently, Pima County, with an estimated population of 863,049 in 2001, is the only member of the class affected by § 42–6108.01. *See* United States Census Bureau, Pima County, Arizona, *available at* http://quic kfacts.census.gov/qfd/states/04/04019.html.

5. The TSA funding mechanism for the Cactus League objective differs in the following respect: The TSA may pledge its revenues, including monies attributable to the multipurpose facility, to collateralize bonds issued to finance Cactus League objectives. A.R.S. § 5–837(C). Although

some inequity might exist in this difference, this fact does not require us to strike the Cactus League objective from the TSA legislation. As noted by the supreme court, "[u]nder the rational basis test ... [a] perfect fit is not required; a statute that has a rational basis will not be overturned merely because it is not made with mathematical nicety, or because in practice it results in some inequality." *Big D. Const. Corp. v. Court of Appeals*, 163 Ariz. 560, 566, 789 P.2d 1061, 1067 (1990) (internal quotations and citation omitted).

6. For example, in September 2000, voters in Yuma County approved the levy of a Yuma County Capital Projects Tax. The tax is applied at ten percent of the transaction privilege tax rate levied by the state.. *See* Transaction Privilege Tax

Thus, should less populated counties desire to fund construction or improvement of amateur and youth sports facilities by imposition of a tax, they may do so. Other statutes not applicable to counties with more than two million residents may additionally authorize such undertakings. *See* A.R.S. § 42–6103 (Supp.2001) (authorizing counties with less than 1.5 million people to levy transaction privilege tax on those subject to statewide transaction privilege tax "to support and enhance countywide services"); A.R.S. § 9–500.11 (1996) (authorizing city or town to appropriate and spend public monies in connection with economic development activities).

¶ 35 In conclusion, we hold that the population-based classification is rationally related to the non-stadium objectives of the TSA legislation because (1) the legislature could have reasonably decided that attainment of these objectives in Arizona's most populous county would maximize the state's chances for quelling economic threats posed by out-of-state communities, and (2) the county was not otherwise sufficiently authorized to fund these objectives.

### 2. Elasticity of classification

¶ 36 The TSA legislation satisfies the third prong of the special law test if the classification is sufficiently elastic to both admit entry of additional counties attaining the requisite characteristics of the classification and enables class members to exit when they no longer have those characteristics. *Republic Inv. Fund,* 166 Ariz. at 150, 800 P.2d at 1258. The legislature may construct a population-based classification that applies only to one county at the time of enactment. *Id.* (citing *Petitioners for Deannexation,* 160 Ariz. at 471, 773 P.2d at 1030). However, "[a] classification limited to a population as of a particular census or date is a typical form of defective closed class; such an act is a form of identification, not of classification, because it is impossible for entities to enter or exit the class with changes in population." *Id.* at 151, 800 P.2d at 1259.

Changes and News, available at the Department of Revenue website, http://www.reve-

¶ 37 Long argues that the TSA legislation is inelastic because no county other than Maricopa County can attain the two classification criteria: a population of more than two million people and passage of the car rental surcharge and hotel tax initiative in an election called not later than August 1, 2000. According to Long, even if other counties achieve the population threshold, they can never enter the TSA classification because they could not call the required election by August 1, 2000. Appellees respond that the 2000 election requirement serves only as a triggering device for the effectiveness of the TSA legislation and is not a criterion for class membership. To determine the legislature's intent, we look first to the language of the legislation, *Calmat of Ariz.,* 176 Ariz. at 193, 859 P.2d at 1326, and will ascribe plain meaning to its terms unless they are ambiguous. *Rineer v. Leonardo,* 194 Ariz. 45, 46, ¶ 7, 977 P.2d 767, 768 (1999). We will also construe the legislation, if possible, to give it a reasonable and constitutional meaning. *State Comp. Fund,* 174 Ariz. at 193, 848 P.2d at 278.

¶ 38 Although only Maricopa County had a population greater than two million people in 2000, the legislature defined the boundaries of the TSA as "*any* county that has a population of more than two million persons." A.R.S. § 5–802(A) (emphasis added). Because the population threshold is not tied to a specific date or census, any county may seemingly enter the class upon achieving the requisite population and may exit upon falling below that level. Thus, under the language of § 5–802(A) alone, the boundaries of the TSA are not permanently confined to Maricopa County. *See Republic Inv. Fund,* 166 Ariz. at 150–51, 800 P.2d at 1258–59 ("A statute worded so as to admit entry and exit from the class implies that the class formation was separate from consideration of particular persons, places, or things and, thus, not intended as special or local in operation.").

nue.state.az.us/stuffers/0101stuffer.htm.

¶ 39 But Long contends an additional criterion for class membership is that any county with the requisite population call an election by August 1, 2000, to authorize collection of the car rental surcharge and hotel tax. If Long is correct, the population classification would be a defective closed class because it would be impossible for counties other than Maricopa County to enter that class despite the broad language of A.R.S. § 5–802(A). *Id.* at 149, 800 P.2d at 1256 (internal quotations and citation omitted) ("Whether a statute is general or special depends on its substance and practical operation, rather than on its title, form or phraseology."). *See also id.* at 151, 800 P.2d at 1259. We therefore consider whether the 2000 election requirement effectively bars expansion of class membership.

¶ 40 The session laws accompanying the TSA legislation provide that "the county" in which the TSA is established must conduct an election called not later than August 1, 2000, to approve levy of the car rental surcharge and hotel tax. ch. 372, § 16(A). As noted, the only county within the TSA as of August 2000 was Maricopa County. If voters in that county had rejected the surcharge and tax levy, the TSA legislation would have been automatically repealed. *Id.* at § 19.

¶ 41 We can reasonably interpret the session laws as reflecting the legislature's intent that the 2000 county election serve as a triggering device for the TSA legislation rather than as a criterion for class participation. First, Long's interpretation would render discretionary language within the statute meaningless. *See Herman v. City of Tucson,* 197 Ariz. 430, 434, ¶ 14, 4 P.3d 973, 977 (App.1999) (holding court should avoid interpreting statute to render any language surplusage). As noted by Appellees, the legislature provided in the statute that qualified electors residing in the TSA, "by majority vote at an election held in the [TSA] may" authorize levy and collection of a car rental surcharge and hotel tax. A.R.S. §§ 5–839, –

840. This election is not tied to any specific date. If the legislature had intended to limit class membership to Maricopa County, which was required to hold an election in 2000 to authorize the assessments described in §§ 5–839 and –840, the permissive language used in those provisions and their references to "an election" would be superfluous. A better interpretation is that the legislature required the only county currently within the TSA classification to hold an election in 2000 and pass the surcharge and tax levy in order to activate the provisions of the TSA legislation. Thereafter, as other counties enter membership in the TSA, qualified electors may similarly vote to levy and collect the car rental surcharge and hotel tax. This construction reconciles the session laws and §§ 5–839 and –840.

¶ 42 Second, construing the 2000 election requirement as a criterion for class membership would conflict with the legislature's pronouncement that the boundaries of the TSA are the boundaries of *any* county having a population of more than two million persons. A.R.S. § 5–802(A). If only one county—Maricopa County—could ever achieve membership in the class, the legislature's description of the TSA boundaries as being those of "any county" with the requisite population would be false.

¶ 43 Long addresses this problem by asserting that we must construe the reference to "any county" in § 5–802(A) to mean "Maricopa County" in light of other provisions in the TSA legislation that refer to a single county [7] and "a multipurpose facility." [8] But as pointed out by the TSA and the Attorney General, the legislature has provided that "[w]ords in the singular number include the plural." A.R.S. § 1–214(B) (1995). Therefore, the legislature's singular references do not require us to construe "any county" as meaning only Maricopa County. This is especially so as other provisions in the legisla-

7. *See e.g.,* A.R.S. §§ 5–803(A) (requiring TSA board members to reside in "the county" in which TSA established), –839(G)(1) (requiring portion of car rental surcharge sent to "the county stadium district established in the county in which [TSA] is located").

8. *See* A.R.S. § 5–807(A) (requiring TSA to build "a multipurpose facility").

tion do not make such singular references.[9]

¶ 44 Long finally argues that the legislature necessarily intended the TSA legislation to forever apply to only Maricopa County as it would be impossible to apply the statutory scheme to a class containing multiple counties. He points out, for example, that car rental surcharge and hotel tax revenues designated to further the tourism objective must be expended in consultation with marketing organizations in "the county" in which the TSA is established and "spent only to promote tourism within that county." A.R.S. § 41–2306(A)(2). But as this court has previously held, what a statute necessarily implies is as much a part of the statute as what is explicitly stated. *Westburne Supply, Inc. v. Diversified Design and Constr., Inc.*, 170 Ariz. 598, 600–01, 826 P.2d 1224, 1226–27 (App.1992). Thus, in light of the provision allowing counties to enter the class upon achieving the requisite population, we can reasonably construe § 41–2306(A) as meaning that monies collected from a car rental surcharge and hotel tax levied in any county within the TSA must be spent to promote tourism within that particular county.[10] *See also* A.R.S. § 1–211(B) (1995) ("Statutes shall be liberally construed to effect their objects and to promote justice.").

¶ 45 In summary, we hold that the population classification used in the TSA legislation is sufficiently elastic because it allows entry and exit from the class upon requisite changes in population. In light of our holding, we do not address alternate arguments raised by the TSA and the Attorney General.

## II. Constitutional debt limitation

¶ 46 Article 9, section 5 of our state constitution enables the state to "contract debts to supply the casual deficits or failures in revenues, or to meet expenses not otherwise provided for," as long as the aggregate amount of such debts never exceeds the sum of $350,000.[11] Long argues that the TSA legislation violates this debt restriction by authorizing the TSA to pledge state income and transaction privilege taxes far exceeding $350,000 as a source of payment to TSA bondholders. The TSA and the Attorney General respond that because the monies pledged for bond redemption come from a "special fund," and the general taxing authority of the state is not available as a payment source, the debt restriction is inapplicable.

¶ 47 As noted by the superior court and all parties to this appeal, application of article 9, § 5 to the fiscal management of our state has proved troublesome, resulting in some confusion. Consequently, in order to resolve whether the bond-payment mechanism is constitutional, we first explore the origins of the debt limitation and the subsequent creation of funding schemes that fall outside that restriction. We then decide whether the TSA bond-repayment mechanism falls within this latter group of financing plans.

### 1. Background and application of constitutional debt limitations

¶ 48 With the onset of the industrial revolution and continued westward expansion of the United States in the early nineteenth century, many states borrowed heavily to finance construction of railroads and canals in an attempt to stake claims to lucrative western trade. Sterk and Goldman, *Controlling Legislative Shortsightedness: The Effectiveness of Constitutional Debt Limitations*, 1991 Wis. L.Rev. 1301, 1306 (1991). Ultimately, irresponsible borrowing and the banking collapse of 1837 produced financial crises in many states. *Id.* at 1308–09. As a result, a number of states adopted constitutional state-debt limitations. *Id.* at 1309. After local governments assumed the burden of financing internal improvements by using the same disastrous financing tactics previ-

---

9. *See e.g.*, A.R.S. § 5–803(B) (mandating appointment of board members from geographically diverse areas of TSA), –807(A) (requiring TSA to hold title to "any multipurpose facility").

10. Indeed, the legislature authorized the TSA to establish "additional accounts and subaccounts as necessary and convenient." A.R.S. § 5–832(A). Consequently, assessments collected from individual counties could be easily segregated for use within those counties.

11. The monetary ceiling does not apply to debt incurred to "repel invasion, suppress insurrection, or defend the State in time of war." Ariz. Const. art. 9, § 5.

ously employed by their state counterparts, many states amended their constitutions to also include local debt limitations. *Id.* at 1312–13. *See also Rochlin v. State,* 112 Ariz. 171, 175, 540 P.2d 643, 647 (1975) (noting limitations on state and local debt adopted by states as a reaction to irresponsible borrowing). As states entered the union after 1840, they invariably included debt limitations in their constitutions. *Employers Ins. Co. of Nev. v. State Bd. of Exam'rs,* 117 Nev. 249, 21 P.3d 628, 631 (2001).

¶ 49 Following the trend set by its sister states, Arizona included state and local debt limitations[12] within its constitution. A review of the discussion at the Constitutional Convention of 1910 reveals that delegates endeavored to establish a debt limitation that would not unduly restrict the state's ability to borrow money to make public improvements. John S. Goff, *The Records of the Arizona Constitutional Convention of 1910,* pp. 939–40. Although Eastern states employed higher debt ceilings, the delegates fixed a $350,000 limitation, which was more in line with restrictions established by Western states at the time. *Id.* at 481–82, 940.

¶ 50 Soon after Arizona achieved statehood status, the legislature discovered that the $350,000 debt limitation severely hampered its ability to fund public improvements. Since that time, the legislature has struggled to remedy this problem by unsuccessfully attempting to amend the constitution[13] and by employing funding mechanisms that fall outside the state-debt restriction.

■ ¶ 51 For example, Arizona and its local governments, either directly or through public authorities and districts, commonly finance public improvements by issuing and selling interest-bearing bonds. If the issuing entity pledges its general taxing authority as a source for return of principal and payment of interest, the state or local debt restriction applies to limit the outstanding monetary amount of these "general obligation bonds."[14] *Tucson Transit Auth.,* 107 Ariz. at 250–51, 485 P.2d at 820–21. However, if the issuing body pays bondholders from a "special fund" comprised of designated monies not emanating from the governmental entity's generally imposed taxes, these so-called "revenue bonds" are not subject to the constitutional debt limitations. *Id.* at 251, 485 P.2d at 821. This is so because the issuing entity assumes no actual or potential liability for bond redemption and is therefore not incurring "debt" within the meaning of the constitutional debt restriction. *Id.; Bd. of Regents of Univ. of Ariz. v. Sullivan,* 45 Ariz. 245, 260, 42 P.2d 619, 625 (1935). Phrased differently, the purpose of the debt limitation is not contravened by revenue-bond financing because the government does not thereby place its credit at jeopardy or risk the need for a tax increase in order to pay debt service. M. David Gelfand, *State & Local Government Debt Financing,* § 2:12 at 20–21 (1986).

¶ 52 In a typical revenue-bond financing scheme, the funded project produces revenues, which are then placed in a special fund and used to return principal and pay interest to bondholders. *See e.g., Crawford v. City of Prescott,* 52 Ariz. 471, 476, 83 P.2d 789, 791 (1938) (holding city did not incur debt within meaning of local debt limitation by selling bonds to purchase and construct civic recreation projects when debt paid wholly from income generated by projects); *Sullivan,* 45 Ariz. at 260, 42 P.2d at 625 (deciding state did not incur debt within meaning of state debt limitation by university's sale of bonds to fund capital improvements when bonds redeemed solely from fees, rents and other

---

**12.** Article 9, § 8 of the constitution, which is not at issue in this appeal, proscribes local governments from incurring debt exceeding a percentage of taxable property within the locality unless the majority of property taxpayers assent at an election.

**13.** *See Clements v. Hall,* 23 Ariz. 2, 4–6, 201 P. 87, 88 (1921) (describing proposed constitutional amendment to allow issuance of state-backed bonds to fund reclamation and irrigation of arable and irrigable lands); *Arizona State Highway*

*Comm'n v. Nelson,* 105 Ariz. 76, 79, 459 P.2d 509, 512 (1969) (discussing 1965 voter rejection of proposed constitutional amendment to raise state-debt limitation to $100,000,000).

**14.** Additionally, such bonds may only be issued after approval by the electorate residing within the boundaries of the issuing entity. Ariz. Const. art. 7, § 13; *Tucson Transit Auth., Inc. v. Nelson,* 107 Ariz. 246, 250, 485 P.2d 816, 820 (1971).

revenues of university). Monies raised by special assessment imposed against persons benefitted by a project may also comprise a special fund. *See e.g., Cyr & Evans Contracting Co. v. Graham,* 2 Ariz.App. 196, 200, 407 P.2d 385, 389 (1965) (concluding that funds raised by special assessment levied on property owners benefitting from street improvement and placed in special fund for payment of bonds issued to fund improvement are not public funds and not subject to the constitutional debt limitation). However, our supreme court has held, without explanation, that ad valorem (property) taxes cannot be used in special-fund financing plans. *City of Phoenix v. Phoenix Civic Auditorium & Convention Ctr. Ass'n, Inc.,* 100 Ariz. 101, 103–04, 412 P.2d 43, 44 (1966) (approving city lease altered to specifically pledge payment of rent from excise taxes and not ad valorem taxes); *see also City of Tucson v. Corbin,* 128 Ariz. 83, 88, 623 P.2d 1239, 1244 (App.1980) (holding ad valorem taxes cannot be placed in special fund).

¶ 53 Identifying additional sources of funds that may be deposited in a special fund and used to pay or secure obligations without invoking the constitutional debt limitations has sparked considerable litigation, including the case before us. Accordingly, we now examine whether the fund of monies used to pay TSA bondholders constitutes a "special fund," thereby removing the TSA legislation from the state-debt restriction.

## 2. Applicability of the constitutional debt restriction to TSA-issued bonds

¶ 54 The TSA legislation authorizes the TSA to issue "revenue bonds" to construct, maintain, and operate a multipurpose facility. A.R.S. §§ 5–861(3), –862(A). The TSA is required to pay bondholders from a segregated "debt service account" comprised of monies dedicated by the TSA board for that purpose. A.R.S. §§ 5–865, –869(A). Additionally, the board may pledge for payment of principal and interest on the bonds "all or part of the revenues and other monies received by the [TSA]," including funds representing (1) income taxes paid by the Arizona Cardinals, its employees and their spouses, (2) transaction privilege taxes paid by persons conducting retail, amusement and restaurant businesses at a multipurpose facility and at professional football games held in Sun Devil Stadium, and (3) transaction privilege taxes paid by persons constructing a multipurpose facility. A.R.S. §§ 5–866, 42–1116(C), –5032.01, 43–209. The TSA is additionally authorized to issue bonds to finance its Cactus League objectives following "[a]s nearly as practicable" the procedures established for issuing bonds to finance a multipurpose facility. A.R.S. § 5–837.

¶ 55 Long argues that the TSA-issued bonds are not true revenue bonds redeemable from a constitutionally permissible "special fund" because that fund is partially comprised of diverted transaction privilege taxes and income taxes, which stem from the state's general taxing authority. According to Long, the TSA's pledge of these taxes places the burden of redeeming the bonds on state taxpayers rather than on income generated from the TSA's operations. Consequently, he contends this pledge creates "debt" within the meaning of article 9, § 5 of the constitution.

¶ 56 Long primarily bases his contention on a pair of cases decided by our supreme court, *Switzer v. City of Phoenix,* 86 Ariz. 121, 341 P.2d 427 (1959) and *Arizona State Highway Comm'n v. Nelson,* 105 Ariz. 76, 459 P.2d 509 (1969), which he construes as limiting the kind of taxes that can comprise a special fund to those constitutionally earmarked for a particular purpose. Because the diverted transaction privilege taxes and income taxes identified in the TSA legislation do not fall within this category, Long asserts that the pledge of these taxes to pay bondholders violates the debt restriction. Our review of *Switzer* and *Nelson* does not support Long's narrow interpretation of these cases.

¶ 57 In *Switzer,* the court was asked to decide whether the City of Phoenix's issuance of highway improvement bonds, payable from the City's share of state-levied Motor Vehicle and Gasoline Tax receipts, violated the local-debt limitation established by the constitution. 86 Ariz. at 123–24, 341 P.2d at 428. The court first cited the majority view that "an obligation payable from a special

fund created by the imposition of fees, penalties, or excise taxes and for the payment of which the general credit of the taxing authority is not pledged is not a debt within the meaning of constitutional debt limitations." *Id.* at 124, 341 P.2d at 428. The court then decided to follow the majority rule "at least to the extent where, as here, the fund from which the obligations are to be paid is created by voluntary contributions of the state to the city." *Id.* at 124, 341 P.2d at 428–29.

¶ 58 Ten years later, in *Arizona State Highway Comm'n v. Nelson*, 105 Ariz. 76, 459 P.2d 509 (1969), the court addressed whether the Arizona Highway Commission violated the state-debt restriction by issuing bonds to finance the acquisition of property intended for future highway needs. Because the bonds were secured by a lien on monies paid into the State Highway Fund from motor vehicle license fees and a share of the Motor Vehicle Fuel Tax, respondents maintained that the bonds were general obligations of the state that exceeded the debt restriction. *Id.* at 78, 459 P.2d at 511. They also criticized the special fund method of deficit financing as violating Arizona's public policy of avoiding substantial debt. *Id.* at 79, 459 P.2d at 513. The court rejected respondents' arguments, citing *Switzer* as "solid authority." *Id.* The court additionally emphasized that because the voters amended the constitution in 1952 to earmark certain motor vehicle taxes and fees for highway and street purposes, Ariz. Const. art. 9, § 14, these monies were not available for general state appropriations and their pledge did not therefore create "state debt." *Id.* at 79–80, 459 P.2d 509, 459 P.2d at 512–13.

¶ 59 Significantly, for purposes of the case before us, the *Nelson* court quoted extensively from the Washington Supreme Court's decision in *State ex rel. Washington State Fin. Comm. v. Martin*, 62 Wash.2d 645, 384 P.2d 833 (1963), which addressed application of the special fund doctrine to Washington's constitutionally created highway fund that included fuel excise taxes and license fees. In describing the special fund financing method, the *Martin* court concluded that an obligation that must be paid from "any taxes levied generally" is a state debt. *Nelson*, 105

Ariz. at 80, 459 P.2d at 513 (quoting *Martin*, 384 P.2d at 842–43). However, because the taxes and fees deposited in the highway fund were constitutionally designated for highway purposes, the court decided that the bonds issued against the fund did not violate the state-debt restriction as the state's general funds were not pledged for payment. *Id.* The *Nelson* court agreed with *Martin*, holding that "where the bonds are payable only from a constitutionally authorized fund, which is separate and distinct from the State's general revenues, the bonds thus funded are obligations of the special fund and not of the state." *Id.* Long seizes on this holding, and the court's particular reliance on *Martin*, as limiting the seemingly broad holding in *Switzer* to mean that only taxes constitutionally designated for a particular purpose can be used in special fund financing without violating the state-debt restriction.

¶ 60 We disagree with Long's narrow reading of *Nelson* for three reasons. First, the court in *Nelson* did not state that taxes can only comprise a special fund if constitutionally designated for a specific purpose. Rather, *Nelson* held only that the taxes at issue in that case could be used to pay debts without violating the state-debt restriction because these monies were not otherwise available for general state appropriations.

¶ 61 Second, we agree with the TSA and the Attorney General that Long's narrow reading of *Switzer* and *Nelson* conflicts with a trilogy of supreme court cases decided about the same time as *Nelson* and relating to the City of Phoenix's financing plan for construction of its civic center. In *City of Phoenix v. Phoenix Civic Auditorium & Convention Ctr. Ass'n., Inc.*, 99 Ariz. 270, 408 P.2d 818 (1965) ("*Civic Center I*"), the court was asked to declare the constitutionality of the City's proposed agreement with a nonprofit entity to construct a civic center and lease it to the City on a long-term basis in return for monthly rental payments. At the end of the lease period, the City would own the civic center. 99 Ariz. at 274, 408 P.2d at 820. Significantly, the City did not pledge any specific source of revenue to pay the monthly rentals. *Id.* Consequently, the court declared the lease-purchase plan unconstitu-

tional because it obligated the City to pay an amount from its general funds in excess of the local-debt limitation. *Id.* at 287–88, 408 P.2d at 829–30.

¶ 62 After the court issued *Civic Center I,* the City asked the court whether the City's financing plan would violate the local-debt limitation if the lease agreement provided that rents would be paid solely from the proceeds of excise taxes and no ad valorem (property) taxes would be used for payment. *City of Phoenix v. Phoenix Civic Auditorium and Convention Ctr. Ass'n, Inc.,* 100 Ariz. 101, 103, 412 P.2d 43, 44 (1966) ("*Civic Center II* "). The court answered "[n]o, providing the excise taxes were proper and valid." *Id.* at 104, 412 P.2d at 44. Relying in part on *Switzer,* the court reasoned that obligations paid from revenues generated by a funded project "and from proper and valid excise taxes, providing no part of such obligation is payable from the general funds, are not within the meaning of constitutional debt limitations...." *Id.* at 103–04, 412 P.2d 43, 412 P.2d at 44. Three years later, and three months before deciding *Nelson,* the court found that the City had fully complied with *Civic Center II* by stating in its agreement that rentals would be paid from a special fund comprised of revenues stemming from ownership and operation of the civic center and excise taxes validly imposed by the City and others not earmarked for other purposes. *City of Phoenix v. Superior Court,* 104 Ariz. 460, 461, 455 P.2d 257, 258 (1969) ("*Civic Center III* "). Had the *Nelson* court intended to restrict the type of taxes that may comprise a special fund, as suggested by Long, it would not have approved the use of excise taxes as a source of payment for the City of Phoenix's construction of its civic center.

¶ 63 Third, and finally, Long's position is further belied by the supreme court's decision in *Tucson Transit Authority,* issued two years after *Nelson* and describing permissible revenue-bond financing. The court, citing *Switzer* and *Nelson,* stated that such bonds may be payable from a special fund supplied with (1) revenue generated by the funded project, (2) voluntary contributions of the state to the city from fees, penalties *or*

*excise taxes already in existence* and not created in anticipation of the bond issue, *or* (3) revenues supplied from a constitutionally authorized fund, separate and distinct from the state's general revenues. *Tucson Transit Auth.,* 107 Ariz. at 251, 485 P.2d at 821. Thus, *Tucson Transit Authority* further supports a conclusion that the *Switzer* and *Nelson* courts did not intend to limit the category of taxes available for payment of special fund obligations to those deposited in a constitutionally authorized fund.

¶ 64 Although we agree with the TSA, the Attorney General, and the superior court that taxes other than those constitutionally prescribed for a particular purpose can be pledged to pay revenue bondholders, we disagree that any taxes other than ad valorem taxes can be used for this purpose without limitation. Otherwise, as pointed out by Long, the legislature could effectively nullify the constitutional debt restrictions simply by segregating general revenues in special funds. *See City of Tucson v. Corbin,* 128 Ariz. 83, 88, 623 P.2d 1239, 1244 (App.1980) (stating such a procedure would constitute constitutional debt as much as an unlimited pledge of general revenues). Such a scheme would contravene the purpose of the debt limitations: preventing the state and local governments from excessively pledging their general taxing authority as a payment source for debt. *See Rochlin,* 112 Ariz. at 175, 540 P.2d at 647.

¶ 65 Our next task, therefore, is to identify the characteristics of the types of taxes that may be included within special funds to pay bondholders. From our review of the purpose of the debt limitations and the previously discussed cases, we decide that taxes other than ad valorem taxes may comprise a special fund without violating the constitution if (1) the taxes are constitutionally designated for purposes furthered by the funded project, *see Nelson,* 105 Ariz. at 80, 459 P.2d at 513, or (2) the relationship between the funded project and the pledged taxes is sufficiently direct and apparent that the taxes may be effectively treated as revenue of the project or otherwise related to its purpose, *see Sullivan,* 45 Ariz. at 260, 42 P.2d at 625; *Tucson Transit Auth.,* 107 Ariz.

at 250–51, 485 P.2d at 820–21; *Convention Center III*, 104 Ariz. at 461, 455 P.2d at 258.[15] If such a relationship exists, the success of the project dictates whether bondholders will be fully paid their principal and interest and the general taxing authority of the state or local government is not placed at risk. In other words, it is the bondholders, not the government or its citizens, who bear the risk of project failure. Bearing these principles in mind, we now decide whether the TSA may constitutionally pledge designated transaction privilege taxes and income taxes to pay and secure bond obligations.

### (i) *Transaction privilege taxes*

¶ 66 The TSA legislation directs the State Treasurer to pay to the TSA transaction privilege taxes paid by multipurpose facility contractors, vendors at such facilities and those at professional football games played at Sun Devil Stadium. A.R.S. § 42–5032.01. We decide that these taxes are sufficiently related to the TSA's objectives so as to exempt those funds from the debt restriction. Absent construction of a multipurpose facility, no taxes would be paid by contractors relating to the construction of such a facility or by vendors who would work there. Moreover, the legislature could have reasonably concluded that unless a multipurpose facility is constructed, the Arizona Cardinals would leave the state and professional football games at Sun Devil Stadium would cease. *See supra* ¶¶ 2–3. Thus, continued payment of transaction privilege taxes by vendors working at such contests is also sufficiently related to the multipurpose facility objective. *See Guthrie v. City of Mesa*, 47 Ariz. 336, 343, 56 P.2d 655, 658 (1936) (holding no distinction between the application of revenues from old utility to creation of special fund and using those from new utility). We therefore hold that the TSA may pledge

these transaction privilege taxes to pay and secure bond obligations.

### (ii) *Income taxes*

¶ 67 The TSA legislation requires the State Treasurer to send the TSA each month the greater of $292,000 (increasing annually by 8%) or one-twelfth of the income taxes paid by the Cardinals, its employees, and their spouses. A.R.S. § 42–1116(C). The legislature could reasonably have decided that without the construction of a new multipurpose facility to house professional football games, the Arizona Cardinals would relocate outside our state and cease paying Arizona income taxes. Should that occur, most if not all of the Cardinals' employees and their spouses would likely follow the franchise and quit paying Arizona taxes on income related to professional football. Thus, the ongoing stream of income taxes paid by the Cardinals, and those income taxes paid by Cardinals' employees and their spouses on income relating to professional football, such as Cardinals' salaries and product endorsement revenues, are dependent on the success of the TSA's construction and operation of a multipurpose facility. For this reason, we conclude that the relationship between a multipurpose facility and the income taxes paid by the Cardinals, as well as those income taxes paid by Cardinals' employees and their spouses relating to professional football, is sufficiently direct and apparent that the TSA can pledge these monies to pay bondholders without violating the state-debt restriction.

¶ 68 However, a similar nexus does not exist between a multipurpose facility and income taxes paid by Cardinals' employees and their spouses on income received from sources unrelated to professional football. Such income cannot be effectively considered revenue of the multipurpose facility or other-

---

15. Other state courts and commentators have constructed similar tests. *See Eakin v. State ex rel. Capital Improvement Board of Managers of Marion County*, 474 N.E.2d 62, 66 (Ind.1985) (holding tax on revenues of funded project may be used to pay bonds because tax has sufficient nexus to project); *Tpk. Auth. of Kentucky v. Wall*, 336 S.W.2d 551, 557–58 (Ky.App.1960) (holding relationship between funded turnpike facility and gas tax sufficiently direct and apparent to effectively treat tax as revenue of project); Beth A. Buday and Donna M. Poczatek, *McQuillin, Municipal Corporations*, vol. 15, § 41.34 at 451 (3d ed. 1995) ("The fund may be supported not only by the revenues generated by the project but by a tax on the revenues generated so long as there is a nexus between the revenue tax and the project for which the bonds were issued.").

wise related to that project. For example, the income taxes paid on the salary earned by a teacher who happens to be married to a Cardinals' employee cannot be viewed as income of a multipurpose facility because the teacher's income is not dependent on the existence of a multipurpose facility. Even if the teacher/spouse relocates outside Arizona with the Cardinals, another Arizona resident would likely fill the teaching position and pay income taxes on his or her salary. Consequently, the TSA cannot pledge these taxes as a source of payment to bondholders.

¶ 69 Likewise, the TSA cannot pledge monies paid to it by the State Treasurer pursuant to A.R.S. § 42–1116(C) that exceeds the amount of income taxes paid by the Cardinals and those income taxes paid by the Cardinals' employees and their spouses on income related to professional football. The Treasurer would necessarily pay such shortfall amounts from the general revenues of the state, which cannot be pledged in excess of the state-debt ceiling. *Civic Center I*, 99 Ariz. at 287–88, 408 P.2d at 829–30.

¶ 70 The TSA legislation authorizes the TSA to pledge "all or part" of the monies received by it to pay and secure obligations owing to bondholders. A.R.S. § 5–866(1), (2). Because we hold that the TSA may not pledge certain income taxes and monies received by it without violating the state-debt restriction, the part of § 5–866 authorizing the TSA to pledge "all" monies received by it is invalid. However, as the balance of § 5–866 permits the TSA to pledge "part" of the monies received by it, the bond-payment mechanism remains workable and we are thus convinced that the legislature would have passed the legislation even without the invalid part. Consequently, we need not declare the entire legislation unconstitutional, but instead sever from § 5–866(1) and (2) the language authorizing the TSA to pledge "all" monies it receives to pay and secure bond obligations. *See Randolph v. Groscost*, 195 Ariz. 423, 427, ¶¶ 13–14, 989 P.2d 751, 755 (1999) (setting forth test for severance of invalid statutory provision).

¶ 71 For the foregoing reasons, we hold that the TSA legislation, after severing language from A.R.S. § 5–866 that authorizes the TSA to pledge all monies received by it to pay and secure bond obligations, does not violate article 9, § 5 of the Arizona Constitution.

## CONCLUSION

¶ 72 For the foregoing reasons, we hold that the TSA legislation is not an unconstitutional special law favoring only Maricopa County. We further decide that the TSA does not violate the constitutional state-debt restriction by pledging specified transaction privilege taxes and income taxes to pay and secure bond obligations. However, the TSA cannot constitutionally pledge income taxes paid by Arizona Cardinals' employees or their spouses on income unrelated to professional football. Likewise, the TSA is prohibited from pledging monies from the state's general funds to pay and secure bond obligations. Consequently, we sever the language from A.R.S. § 5–866(1) and (2) that authorizes the TSA to pledge "all" revenues and monies received by it to pay and secure bond obligations. With this modification to the superior court's judgment, we affirm.

CONCURRING: JEFFERSON L. LANKFORD and WILLIAM F. GARBARINO, Judges.